[No. F024223. Fifth Dist. Sept. 9, 1996.]

CHERIE A. SPITZE, Plaintiff and Respondent, v.
FRANK S. ZOLIN, as Director, etc., Defendant and Appellant.

## COUNSEL

Daniel E. Lungren, Attorney General, Martin H. Milas, Assistant Attorney General, Marybelle D. Archibald and Steven L. Simas, Deputy Attorneys General, for Defendant and Appellant.

James Wm. Webster for Plaintiff and Respondent.

## OPINION

DIBIASO, J.—Vehicle Code section 23157,[1] the implied consent law (*Kessler* v. *Department of Motor Vehicles* (1992) 9 Cal.App.4th 1134, 1136 [12 Cal.Rptr.2d 46]), provides in part that any person who has been lawfully arrested for specified violations of the Vehicle Code (including, as here, § 23152) "is deemed to have given his or her consent to chemical testing of his or her blood, breath, or urine for the purpose of determining the alcoholic content of his or her blood . . . ." (§ 23157, subd. (a)(1).) The statute also authorizes the immediate seizure of the person's license to drive and service on the person of a notice of suspension or revocation of the person's driving privilege effective 30 days from the date of arrest. (§ 23157, subd. (f).) In this connection, subdivision (g) of section 23157 reads: "The peace officer shall immediately forward a copy of the completed notice of suspension or revocation form and any driver's license taken into possession under subdivision (f), with the report required by Section 23158.2, to the department. If

---

[1] All statutory references are to the Vehicle Code unless otherwise stated.

the person submitted to a blood or urine test, the peace officer shall forward the results immediately to the appropriate forensic laboratory. *The forensic laboratory shall forward the results of the chemical tests to the department within 15 calendar days of the date of the arrest.*" (Italics added.)

We hold that a forensic laboratory's failure to forward the results of a chemical test to the Department of Motor Vehicles (DMV) within the prescribed 15 calendar days does not automatically render the test results inadmissible in an administrative license suspension proceeding.

### STATEMENT OF FACTS

At approximately 8 p.m. on January 22, 1995, Tuolumne County Sheriff's Deputy Moses discovered a car over the embankment on Middle Camp Road. He found respondent Cherie A. Spitze still sitting, with her seat belt on, in the driver's seat of the vehicle. Spitze showed signs of intoxication. Her daughter reported that Spitze had had too much to drink and had lost control of the car as she attempted to enter Middle Camp Road from a driveway.

California Highway Patrol Officer Ayres arrived around 8:12 p.m. When he contacted Spitze, he noticed, in addition to other symptoms of intoxication, a strong odor of alcoholic beverage emanating from her. Based on his investigation, Officer Ayres formed the opinion that Spitze was under the influence of alcohol.

At 8:40 p.m., Spitze was arrested for driving under the influence of alcohol and with a blood-alcohol content of more than .08 percent (§ 23152, subds. (a), (b)). A blood test taken at 9:35 that evening showed Spitze's blood-alcohol level to be .21 percent.

### PROCEDURAL HISTORY

On January 22, 1995, Officer Ayres issued Spitze a written administrative per se order of suspension. This document advised Spitze that her driving privilege would be suspended or revoked effective 30 days from the date of her arrest because the officer believed the results of a chemical test would show her blood-alcohol concentration to be .08 percent or more.

On February 1, 1995, Spitze requested an administrative hearing. The hearing was held on March 2, 1995. The report of the forensic laboratory, showing Spitze's blood-alcohol content to be .21 percent, was offered in evidence at the hearing. This report, which reflected that Spitze's blood had

been analyzed on February 14 or 15, was dated February 17, 1995. Spitze asserted the test results were not actually forwarded to DMV until February 23, more than a month after Spitze's January 22 arrest; she therefore objected to admission of the results because the laboratory had not complied with the 15-calendar-day limit set by section 23157, subdivision (g).

Spitze's objection was overruled. The hearing officer decided that while the laboratory report might not have been timely sent to DMV, the error was not fatal because the hearing was scheduled with the agreement of Spitze's lawyer and the hearing officer notified counsel two days before the hearing that the blood test results were available.[2]

After the administrative hearing, DMV suspended Spitze's driving privilege for four months, effective March 8, 1995. On April 3, Spitze challenged the suspension order by filing a petition for alternative writ of mandate.[3] An alternative writ was issued, and a hearing was held on May 16, 1995. The parties agreed that the only issue before the superior court was the legal effect of the forensic laboratory's failure to comply with the 15-calendar-day time limit set out in section 23157, subdivision (g). After argument, the superior court granted Spitze's petition. DMV now appeals from the ensuing judgment which ordered the immediate reinstatement of Spitze's driving privilege.

DISCUSSION

 DMV contends the superior court erred in granting Spitze's petition because the blood test results were properly considered by the hearing officer even though the laboratory did not forward them to DMV "within 15 calendar days of the date of the arrest." (§ 23157, subd. (g).) We agree.

 We review the trial court's independent assessment of the administrative record and not the findings of the administrative agency. (*Webb* v. *Miller* (1986) 187 Cal.App.3d 619, 625 [232 Cal.Rptr. 50].) We will reverse the judgment of the superior court only if it is based upon an erroneous conclusion of law. (*Ibid.*) Because the pertinent facts of this case are not in conflict and the only issue before us involves the proper application of subdivision (g) of section 23157, we are not bound by the trial court's conclusions concerning the effect of the laboratory's failure to comply with the time stricture of that statute. (*Webb, supra,* at p. 625; see *Burden* v.

---

[2]Although the record is not clear, it appears the report was transmitted by facsimile to counsel on the morning of the hearing.

[3]The petition may have been untimely. (See § 13559.) However, DMV failed to demur on this ground and has not raised the issue on appeal. (See *Johanson* v. *Department of Motor Vehicles* (1995) 36 Cal.App.4th 1209, 1212-1215 [43 Cal.Rptr.2d 42].)

*Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *Moomjian* v. *Zolin* (1993) 12 Cal.App.4th 1606, 1612 [16 Cal.Rptr.2d 335]; *Goddard* v. *South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 105 [144 Cal.Rptr. 701].)

 Section 15, one of the "General Provisions" of the Vehicle Code, states that "shall" is mandatory and "may" is permissive (§ 15; *Hough* v. *McCarthy* (1960) 54 Cal.2d 273, 279 [5 Cal.Rptr. 668, 353 P.2d 276].) Although relevant, this directive is not, as Spitze argues, conclusive. To determine that the word "shall" must be construed to mean the opposite of "permissive" or "discretionary" is only the first step of the necessary analysis. As the California Supreme Court recently explained: "The word 'mandatory' may be used in a statute to refer to a duty that a governmental entity is required to perform as opposed to a power that it may, but need not exercise. As a general rule, however, a ' "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' [Citation.] If the action is invalidated, the requirement will be termed 'mandatory.' If not, it is 'directory' only." (*California Correctional Peace Officers Assn.* v. *State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145 [43 Cal.Rptr.2d 693, 899 P.2d 79].)

Thus, although section 15 requires that we read the word "shall" in section 23157 to mean that the testing laboratory "must," rather than "may," forward chemical test results to DMV within 15 calendar days of the arrest of the suspect, there still remains the question of what effect must be given to a violation of section 23157's terms. (See *People* v. *Superior Court (Maria)* (1992) 11 Cal.App.4th 134, 143-144 [13 Cal.Rptr.2d 741]; *Woods* v. *Department of Motor Vehicles* (1989) 211 Cal.App.3d 1263, 1272 [259 Cal.Rptr. 885].)

To decide this issue, we again refer to *California Correctional Peace Officers Assn.* v. *State Personnel Bd., supra,* 10 Cal.4th 1133. That case involved Government Code section 18671.1, which specifies the time within which the California State Personnel Board "shall" render a decision following a hearing on or investigation of a state employee's appeal from a disciplinary action. Like the Vehicle Code, the Government Code contains a general provision that "shall" is mandatory and "may" is permissive. (Gov. Code, § 14.) In deciding whether the obligatory connotation of the word

"shall" was mandatory or directory in effect, the Supreme Court articulated the applicable principles of statutory construction: "Time limits are usually deemed to be directory unless the Legislature clearly expresses a contrary intent. [Citation.] 'In ascertaining probable intent, California courts have expressed a variety of tests. In some cases focus has been directed at the likely consequences of holding a particular time limitation mandatory, in an attempt to ascertain whether those consequences would defeat or promote the purpose of the enactment. [Citations.] Other cases have suggested that a time limitation is deemed merely directory "unless a consequence or penalty is provided for failure to do the act within the time commanded.' " [Citation.] As *Morris* v. *County of Marin* [(1977)] 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606], held, the consequence or penalty must have the effect of invalidating the government action in question if the limit is to be characterized as 'mandatory.' " (*California Correctional Peace Officers Assn.* v. *State Personnel Bd., supra,* 10 Cal.4th at p. 1145.)

The Supreme Court reasoned that although Government Code section 18671.1 uses the word "shall," the statute provides neither a sanction nor a remedy for failure to comply with its time limits. (*California Correctional Peace Officers Assn.* v. *State Personnel Bd., supra,* 10 Cal.4th at pp. 1137-1138 & fn. 1.) Although the plaintiff argued the time limit was mandatory and intended to provide a benefit to employees (*id.* at p. 1141), the high court held the requirement to be directory, not mandatory (*id.* at p. 1138). (See also *Edwards* v. *Steele* (1979) 25 Cal.3d 406, 409-411 [158 Cal.Rptr. 662, 599 P.2d 1365] [construing municipal ordinance] & cases cited; *People* v. *McGee* (1977) 19 Cal.3d 948, 958-960 [140 Cal.Rptr. 657, 568 P.2d 382] [construing Welf. & Inst. Code, §§ 15, former 11483]; *Woods* v. *Department of Motor Vehicles, supra,* 211 Cal.App.3d at p. 1270 [construing § 16075, subd. (b)].)

 We reach the same result with respect to section 23157, subdivision (g), by applying the analytical standards set out in *California Correctional Peace Officers Assn.*[4] First, no penalty or consequence is specified in the statute for breach of the time limit. Second, the Legislature has not clearly expressed an intent that the time limit imposed upon testing laboratories be mandatory instead of directory. Finally, as we will explain, a holding that "shall" in section 23157, subdivision (g), is mandatory in effect would defeat the underlying purposes sought to be achieved by the implied consent law,

---

[4]In interpreting the section, we are mindful that " '[r]emedial statutes such as [section 23157] "must be liberally construed to effect their objects and suppress the mischief at which they are directed. They should not be given a strained construction that might impair their remedial effect." ' [Citations.]" (*Lee* v. *Department of Motor Vehicles* (1983) 142 Cal.App.3d 275, 282-283 [191 Cal.Rptr. 23].)

which goals are entitled to preference over the interests of persons facing suspension of their driving privileges.

■ The competing considerations have been spelled out. On the one hand, the implied consent law "was enacted to fulfill the need for a fair, efficient and accurate system of detection and prevention of drunken driving. [Citations.] The immediate purpose of [section 23157] is to obtain the best evidence of blood alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated. The long range purpose is . . . to inhibit intoxicated persons from driving on the highways. [Citation.]" (*Kesler* v. *Department of Motor Vehicles* (1969) 1 Cal.3d 74, 77 [81 Cal.Rptr. 348, 459 P.2d 900].) "The need for the administrative per se statutes arose from the fact that '[t]he legal process leading to imposition of a suspension sometimes [took] years from the time of arrest.' [Citation.] 'Many drivers with high chemical test results fail[ed] to have sanctions taken against their driving privilege because of reduction in charges as the result of "plea-bargaining" or pre-trial diversion programs.' [Citation.] In enacting the administrative per se law, the Legislature intended to establish 'an expedited driver's license suspension system' [citations] that would 'reduce court delays. The suspension will be swift and certain and will be more effective as a deterrent. . . .' [Citation.]" (*Bell* v. *Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 312 [13 Cal.Rptr.2d 830].) Thus, "[t]he express legislative purposes of the administrative suspension procedure are: (1) to provide safety to persons using the highways by quickly suspending the driving privilege of persons who drive with excessive blood-alcohol levels; (2) to guard against erroneous deprivation by providing a prompt administrative review of the suspension; and (3) to place no restriction on the ability of a prosecutor to pursue related criminal actions. [Citations.]" (*Gikas* v. *Zolin* (1993) 6 Cal.4th 841, 847 [25 Cal.Rptr.2d 500, 863 P.2d 745].)

On the other hand, driving "has always been respected by our courts as having great practical importance, although it has never been given the constitutional status of a 'fundamental right' for due process or equal protection purposes." (*Snelgrove* v. *Department of Motor Vehicles* (1987) 194 Cal.App.3d 1364, 1376 [240 Cal.Rptr. 281].) Thus, a driver threatened with suspension of his or her driving privilege has a considerable interest in a timely resolution of the controversy and possible exoneration.

■ Notwithstanding the legitimate concerns of those facing suspension of their driving privileges, "[d]eterring drunk driving and identifying and removing drunk drivers from the roadways undeniably serves a highly important governmental interest." (*Ingersoll* v. *Palmer* (1987) 43 Cal.3d

1321, 1338 [241 Cal.Rptr. 42, 743 P.2d 1299].) We believe this interest would be defeated if a drunk driver could automatically escape license suspension simply because a forensic laboratory independent from DMV, the public agency responsible for conducting the administrative proceeding, neglected to provide the test results to DMV within the statutory time period.

*Woods* v. *Department of Motor Vehicles, supra,* 211 Cal.App.3d 1263 supports our conclusion. In that case, a driver requested an administrative hearing regarding the suspension of his license for failure to prove financial responsibility. The hearing was held more than 30 days from the date of demand, contrary to the provisions of section 16075, subdivision (b). The driver challenged the ensuing suspension in a mandate proceeding; his writ petition was denied. (*Woods, supra,* at p. 1265.) The Court of Appeal affirmed, stating: "While Woods is correct in concluding the word 'shall' connotes administrative action is required, it does not necessarily follow that the result of a failure to act within the legislatively prescribed time period is nullification of the action or loss of jurisdiction." (*Id.* at p. 1266.) The appellate court decided that "[t]he likely consequences of holding mandatory the time period for the hearing involved here are wholly inconsistent with the Legislature's intent in passage of the financial responsibility laws." (*Id.* at p. 1268.) The court summarized: "[I]n 1983 a committee of the Legislature found [DMV] was not enforcing the law against uninsured drivers. In 1984 the Legislature enacted a new detection scheme . . . , ordered [DMV] to study an alternative detection and enforcement scheme . . . and appropriated a large amount of money to automate [DMV's] enforcement capability. Having gone to all this trouble to assure [DMV] reduces the number of uninsured motorists, we cannot accept Woods's argument that it intended to forego enforcement and therefore deprive [DMV] of jurisdiction whenever it fails to act within the prescribed time period. Nothing in the statutory scheme or legislative history supports such a conclusion and in the absence of such legislative support we must assume the time period set for hearing is directory only. [Citation.]" (*Id.* at p. 1270.)

Although here we are not faced with a problem of jurisdiction, we find the *Woods* analysis persuasive. A holding that the time limit in section 23157, subdivision (g), is mandatory would undermine the Legislature's overarching intention to "inhibit intoxicated persons from driving on the highways" (*Kesler* v. *Department of Motor Vehicles, supra,* 1 Cal.3d at p. 77) and elevate procedure over substance to the detriment of the law-abiding users of this state's roads (see *Gikas* v. *Zolin, supra,* 6 Cal.4th at p. 847). At the same time, effectively punishing DMV for an omission which is in all likelihood beyond its control would not serve to guard against erroneous deprivations of the driving privilege (*ibid.*); we have found nothing in fact or reason

which suggests that a delay in furnishing test results to the DMV affects in any way the accuracy of a chemical analysis.

None of Spitze's arguments change our mind. Spitze first says that a 1993 amendment to section 23157, which brought subdivision (g) to its current form, indicates a legislative intent to make the time limit in the subdivision mandatory in effect. Before the amendment, subdivision (g) of section 23157 read in relevant part: "If the person submitted to a blood or urine test, the peace officer shall cause the results of the chemical test to be forwarded to the department within 20 calendar days of the date of the arrest." Spitze asserts that by the amendment the Legislature "specifically acted to insert mandatory language in the place of directory language . . . ."

We disagree. We fail to see how replacement of the phrase "shall cause . . . to be forwarded" with the words "shall forward" implies what Spitze claims it does. The amendment appears to be nothing more than a recognition that, in the case of a blood or urine test, there is a third party between the peace officer and DMV, namely the forensic laboratory. The amendment simply puts the duty of meeting the 15-calendar-day time constraint on the laboratory, where it would appear to belong.

Spitze also contends that, in construing the statute, we should favor the interests of drivers over the interests of DMV. She receives some support from the portion of the 1993 amendment which shortened the prescribed time from 20 calendar days to 15 calendar days. This change may have been calculated to benefit drivers by insuring they will have the test data as early as possible in order to effectively challenge, through retesting or other means, an adverse test result. On this point, we again turn to *Woods*.

As explained in *Woods*, prior to 1985 section 16075 required DMV to give a driver 20 days' notice of its intent to suspend his or her license; the driver had 20 days from receipt of the notice to request a hearing; if a hearing was requested, DMV was required to conduct it within 60 days, but no time limit was imposed upon the DMV to determine the controversy. The statute was then amended to require DMV to give only 15 days' notice of its intent to suspend; the driver was allowed only 10 days in which to request a hearing; DMV was required to conduct any hearing within 30 days; and DMV was obliged to render a decision within 15 days after conclusion of the hearing. During all these successive time periods the driver was free to use his or her vehicle. (*Woods* v. *Department of Motor Vehicles, supra,* 211 Cal.App.3d at p. 1268.) In finding the statutory modifications did not warrant a conclusion that the time within which DMV was compelled to hold a hearing was mandatory, the *Woods* court stated:

"While certainly the shortening of such time periods might in some sense benefit the subject driver by setting a time certain within which he will be left to ponder his fate, in light of the expressed legislative intent and the driver's ability to continue driving during the period of the stay, we conclude the goal of the 1984 amendments was to remove the uninsured motorist from the road and thereby encourage drivers to remain financially responsible.

"To accept Woods's argument giving the time limit set forth in section 16075, subdivision (b), mandatory rather than directory effect would allow drivers who are not financially responsible to escape the suspension otherwise required by section 16070. Such an interpretation is clearly inconsistent with the purpose of the time limits set forth in the 1984 amendment. Plainly the goal of promptly suspending financially irresponsible drivers would not be served by allowing them to avoid suspension altogether. Moreover, it would result in permitting such drivers to traverse the streets until such time as another accident occurs. While such a process might eventually result in securing suspension of such a driver, it would be of little comfort to the individuals at whose personal and financial expense this driver will be removed from the road. This is not the intent of the 1984 amendment." (*Woods* v. *Department of Motor Vehicles*, *supra*, 211 Cal.App.3d at p. 1270.)

The same reasoning applies here. The legislative purpose underlying section 23157 would not be served by allowing an intoxicated driver to escape suspension altogether just because the laboratory was late in forwarding test results.

Spitze seeks to distinguish *Woods* and relies instead on *Austin* v. *Department of Motor Vehicles* (1988) 203 Cal.App.3d 305 [249 Cal.Rptr. 618]. In *Austin*, another case involving a license suspension for failure to establish proof of financial responsibility, DMV did not render a decision within 15 days of the close of the formal hearing, as required by section 16075, subdivision (e). (*Austin*, *supra*, at pp. 306-307.) The appellate court held the suspension invalid. It concluded that the word "shall" in subdivision (e) was mandatory, not directory, since the Legislature was presumed to have been aware of the "may"-"shall" distinction when it enacted the subdivision. (*Id.* at p. 309.) The court rejected DMV's contention that the time limit should be deemed directory because an important public interest was at stake and the driver was not prejudiced by the delay, stating: "The argument that the important social policy represented by the financial responsibility law and the burdens upon the administrative agency charged with its enforcement justify relaxation of the statutory time limit is better made to the Legislature than the courts. No principle of statutory construction permits us to accept this theory, and to do so would eliminate uniformity and certainty in the

administrative process and thereby create a far larger problem than now troubles the DMV." (*Id.* at p. 310.)

In addition to finding *Woods* to be the better reasoned opinion, we think *Austin* has been undermined by *California Correctional Peace Officers Assn.* v. *State Personnel Bd.*, *supra*, 10 Cal.4th 1133. As noted in *Woods*, the *Austin* court "did not engage in a separate inquiry to determine whether the obligatory terms of the statute should nonetheless be given 'directory' effect," despite the teaching to that effect of *People* v. *McGee*, *supra*, 19 Cal.3d 948 and similar cases. (*Woods* v. *Department of Motor Vehicles*, *supra*, 211 Cal.App.3d at p. 1272.) *California Correctional Peace Officers Assn.* v. *State Personnel Bd.*, *supra*, 10 Cal.4th 1133, leaves no doubt that such an inquiry is essential.[5]

We now turn to the matter of prejudice. (See *Woods* v. *Department of Motor Vehicles*, *supra*, 211 Cal.App.3d at p. 1272 [leaving to case-by-case examination whether a given failure to comply with § 16075, subd. (b) results in prejudice sufficient to invalidate the action taken against a driver by DMV].) Spitze claims she was actually prejudiced, and her due process rights violated, because she was not notified that the blood test results were available until two days before the hearing, and her attorney did not actually receive the results until the morning of the hearing. She complains she was not afforded the opportunity to review the results for any irregularities or to obtain an expert opinion for defensive purposes.

We will not presume prejudice merely because a litigant utters the words "due process" or shows a potential for harm. (See, e.g., *People* v. *Horton* (1996) 11 Cal.4th 1068, 1140 [47 Cal.Rptr.2d 516, 906 P.2d 478] [claim of excessive delay in appellate process]; *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1177 [9 Cal.Rptr.2d 834, 832 P.2d 146] [claim of ineffective assistance of counsel]; *People* v. *Kirkland* (1994) 24 Cal.App.4th 891, 916 [29 Cal.Rptr.2d 863] [claim of inadequate time for trial preparation based on failure of custodial official to meet statutory deadline for submitting mental status evaluation]; *People* v. *Abdel-Malak* (1986) 186 Cal.App.3d 359, 367-368 [233 Cal.Rptr. 115] [claim of inadequate opportunity to prepare for trial following speedy trial demand under Pen. Code, § 1381].) While there may exist circumstances under which a laboratory's failure to comply with section 23157, subdivision (g), will result in harm significant enough to

---

[5]Spitze asks us to take judicial notice of briefs filed by DMV in other appeals in which DMV has argued that certain statutes impose upon DMV a mandatory duty. The request is denied. Since the materials do not refer to these parties or to subdivision (g) of section 23157, they have no bearing on the limited legal question at hand. (See *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1144, fn. 5 [265 Cal.Rptr. 111, 783 P.2d 698].)

warrant overturning a license suspension, Spitze has, at most, demonstrated only that the time span between availability or receipt of the test results and the hearing was short. Such a showing is inadequate to establish prejudice especially where, as here, the driver could have, but did not, take steps to earlier subpoena the test results or to seek a continuance of the administrative hearing. (See *Monaghan* v. *Department of Motor Vehicles* (1995) 35 Cal.App.4th 1621, 1626 [42 Cal.Rptr.2d 167]; § 14104.5.)

■ Finally, Spitze maintains DMV failed to meet its burden of proof at the suspension hearing. Spitze recognizes that under Evidence Code section 664, there is a presumption that official duty has been regularly performed; hence, when there is a laboratory report of chemical test results, the burden is on the licensee to demonstrate the test was not properly performed. (See, e.g., *Santos* v. *Department of Motor Vehicles* (1992) 5 Cal.App.4th 537, 547-548 [7 Cal.Rptr.2d 10]; *Imachi* v. *Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 817 [3 Cal.Rptr.2d 478].) She claims this presumption was rebutted because the report showed the blood analysis was not completed in a timely manner, which in turn raised questions about how the blood sample was transported to the laboratory and stored and consequently whether the results might have been affected by such a delay. She seeks to have us conclude from these facts that even if the laboratory's failure to meet the 15-calendar-day limit did not render the test results inadmissible, such results did not establish grounds for suspension because "there was a high likelihood that the laboratory had not performed its official duty and that the testing process may have been flawed in additional ways as well."[6]

In our estimation, the mere failure to comply with the time limit specified in subdivision (g) of section 23157 is not sufficient to rebut the presumption of official duty regularly performed. The report from the forensic laboratory is certified under penalty of perjury and recites that the blood sample was analyzed for alcohol content at a qualified, licensed laboratory by a qualified analyst meeting the requirements of section 1216.1 of title 17 of the California Code of Regulations, and that the analysis utilized the methods required by section 1220 of title 17. California Code of Regulations, title 17, section 1216.1, subdivision (a)(5), provides that a laboratory meets the qualifications for licensing in part by showing the ability to meet the requirements set forth in those regulations. Subdivision (b) of that section provides that the qualifications must be maintained at all times by each

---

[6]We ignore the question whether Spitze waived this point for appellate purposes because this contention was not alleged in Spitze's petition nor presented to the trial court. (See *Title Ins. Co.* v. *State Bd. of Equalization* (1992) 4 Cal.4th 715, 733 [14 Cal.Rptr.2d 822, 842 P.2d 121] [stipulation limiting issues in trial court]; *Vitale* v. *City of Los Angeles* (1936) 13 Cal.App.2d 704, 706 [57 P.2d 993] [same]; see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 305 et seq., p. 316 et seq. [waiver of error].)

licensed laboratory. California Code of Regulations, title 17, section 1219.1, subdivision (g), requires that the laboratory retain a portion of the blood sample for one year in order to allow for analysis by the defendant. We may reasonably infer from this latter regulation that test results on blood stored in a laboratory licensed pursuant to, and meeting the requirements of, title 17 is not affected by the passage of such time as elapsed in this case. Under these circumstances, any delay in analysis was insufficient to rebut the presumption under Evidence Code section 664. Moreover, the record does not disclose any reason to question the blood sample's transportation to the laboratory or manner of storage. Accordingly, DMV was entitled to rely on the test report. (See *Santos* v. *Department of Motor Vehicles, supra,* 5 Cal.App.4th at pp. 547-548; *Imachi* v. *Department of Motor Vehicles, supra,* 2 Cal.App.4th at p. 817.)

To sum up, under all the standards of construction described in *California Correctional Peace Officers Assn.* v. *State Personnel Bd., supra,* 10 Cal.4th at page 1145, a violation of the 15-calendar-day requirement of section 23157, subdivision (g) does not of itself make the results of a chemical test inadmissible in an administrative license suspension proceeding. (See, e.g., *Edwards* v. *Steele, supra,* 25 Cal.3d at p. 410.) Because Spitze has not proved she was prejudiced by such a mistake, the trial court erred in granting Spitze's petition.

### DISPOSITION

The judgment is reversed. The case is remanded to the trial court with directions to enter an order denying Spitze's petition for writ of mandate and reinstating the suspension order. Each party shall bear its own costs on appeal.

Stone (W. A.), Acting P. J., and Wiseman, J., concurred.